**BANKRUPTCY ESTATE OF**

**1777 HOMES LLC**

**AS SELLER**

AND

**CUBE 4 EQUITIES, INC.**

**AS BUYER.**

_____

**CONTRACT**

_____

**PREMISES: 1777 NOSTRAND AVENUE, BROOKLYN, NY 11226**
**BLOCK 4947, LOT 76**

**AS OF FEBRUARY __, 2024**

<u>**CONTRACT**</u>

Contract of Sale (the "<u>**Agreement**</u>" or "<u>**Contract**</u>"), made as of **February \_\_\_\_, 2024** between **THE BANKRUPTCY ESTATE OF 1777 HOMES LLC**, a New York limited liability company, having its principal business address at 40 Skillman Street, Brooklyn, NY 11205 (hereinafter referred to as "<u>**Seller**</u>"), and **CUBE 4 EQUITIES, INC.,** a New York corporation, having its principal address at 420 East 61st Street, Apt. 22D, New York, NY 10065 or its designee (hereinafter referred to as "<u>**Buyer**</u>").

1.      <u>**Defined Terms**</u>.  The terms set forth on <u>Schedule 1</u> constitute defined terms in this Contract, and, when used in this Contract, they shall have the respective meanings set forth on <u>Schedule 1</u>.

2.      <u>**Purchase and Sale of Assets**</u>.

2.1      On the Closing Date and upon the terms and conditions of this Contract and following the Bankruptcy Court Approval via confirmation of a plan of reorganization or otherwise, Seller shall sell, transfer and convey to Buyer, and Buyer shall purchase, acquire and receive from Seller, free and clear of all Encumbrances, other than the Permitted Encumbrances, all of Seller's right, title and interest in and to the following:

(a)      the land, buildings and improvements situated therein (the "<u>**Building**</u>"), commonly known as 1777 Nostrand Avenue, Brooklyn, NY, together with any personal property attached to or used in the operation of the Building (the Land and Buildings available are collectively referred to as the "<u>**Premises**</u>");

(b)      all records relating to the Premises; and

(c)      all Governmental Authorizations owned, held or utilized by Seller with respect to the operation of the Premises to the extent transferable to Buyer (the "<u>**Permits**</u>"); and

2.2.      Notwithstanding anything to the contrary set forth in Section 2.1 or elsewhere in this Contract, Seller is not selling or otherwise transferring to Buyer any of, and Buyer shall acquire no interest in or to, the following:

(a) all books, records, files and papers (whether in hard copy or computer format) that are not used in, or that do not relate to or affect, the Premises;

(b)      any Governmental Authorization that relates to or affects the Premises which is not assignable or transferable;

(c)      any insurance policies to which Seller is a party, except as expressly provided by this Contract; and

(d)      any other personal property of Seller, wherever located, except those items located on the Premises and used in connection with the Premise.

3.    **Purchase Price**.

3.1.    The purchase price for the Premises (the "**Purchase Price**") is One Million Two Hundred Fifty Thousand and 00/100 ($1,250,000) Dollars, payable as follows:

(a) Deposit in the total sum of One Hundred Twenty Five Thousand and 00/100 ($125,000) Dollars (the "**Good Faith Deposit**" or "**Deposit**") payable upon execution of the Contract. The payment of the Good Faith Deposit shall be made in immediately available federal funds wired to an account designated by the Escrow Agent (hereinafter defined) The Good Faith Deposit shall be held in escrow as hereinafter provided in Seller's counsel IOLA account without interest.

(b)    The balance of One Million One Hundred Twenty Five Thousand and 00/100 ($1,125,000) Dollars to be paid at the Closing by immediately available federal funds wired to the account designated by Seller or Seller's attorneys prior to the Closing.

3(A)    **No Further Due Diligence and No Finance Contingency**. All due diligence relating to the Premises has been completed and no further due diligence is required by Buyer or will be a condition to the sale. Additionally, this Contract is not subject to any type of financing contingency of any kind.

4.    **State of Title**. Buyer shall accept fee simple title to the Premises, free and clear of all Encumbrances pursuant to 11 U.S.C. §§ 363 (b) and (f) and 1123, but subject to the following (collectively, the "**Permitted Encumbrances**"):

4.1.    All building, zoning and other restrictions, regulations, requirements, laws, ordinances, resolutions and orders of any state, municipal, federal or other governmental authority, including all boards, bureaus, commissions, departments and bodies thereof, now or hereafter having or acquiring jurisdiction over the Premises or the use or improvement thereof.

4.2.    Covenants, easements and restrictions of record as of the date hereof provided same does not prevent the current use and maintenance as presently constituted.

4.3.    Any state of facts shown on the existing survey and any state of facts shown on any updated survey provided same does not render title unmarketable.

4.4.    INTENTIONALLY OMITTED.

4.5.    Rights, if any, relating to construction, maintenance and operation of public utility lines, wires, poles, cables, pipes, distribution boxes and other equipment and installations on, over and under the Premises; provided, same does not impose a monetary obligation on the owner of the Premises of more than $5,000.

4.6.    Minor encroachments and projections of areas, cornices, trim, fences, hedges, retaining walls, awnings, canopies, ledges, or other improvements or installations from the Premises onto any street or highway or onto adjoining property, and encroachments of similar elements

projecting from adjoining property over the Premises, provided the Title Company will affirmatively ensure that encroachments over adjoining property may remain as long as building stands.

4.7.    Real estate Taxes and related charges, if any, subject to adjustment as hereinafter provided.

4.8.    Minor imperfections of title, if any, none of which is substantial in amount, materially detracts from the value or impairs the use of the Premises and is of a nature that a recognized title company would not either insure over or provide affirmative coverage against such imperfection without additional premium.

4.9.    Any other matter which the Title Company may raise as an exception to title, provided the Title Company will insure against collection or enforcement of same out of the Premises without any special premium or endorsement.

4.10.    Any Encumbrance to which Buyer waives or is deemed to waive objection under the terms of this Contract.

5.    **Objections to Title**.

5.1    Upon being designated as the stalking horse, Buyer shall order a title insurance commitment from First American Title Company of America or such other nationally recognized title company through an abstract company of Buyer's choice (the "**Title Company**").  All updates, supplements and continuations of the title commitment and subsequent searches (collectively, the "**Title Updates**") shall be promptly furnished to the Bankruptcy Estate's attorneys, Goldberg Weprin Finkel Goldstein LLP, Attention:  Kevin J. Nash, Esq., 125 Park Avenue, 12th Floor, New York, NY 10017 (hereinafter, "Seller's Attorneys").  Buyer shall deliver to Seller's attorneys not later than ten (10) business days after Buyer's counsel receipt of any Title Updates (the **"Title Objection Notification Date"**), a letter from Buyer or Buyer's attorneys setting forth any objections to title as stated in the applicable Title Update.  A copy of the Title Updates shall be deemed to be Buyer's objections to title.

5.2    Buyer shall accept fee title to the Premises as the Title Company will insure in accordance with an Order of the Bankruptcy Court having jurisdiction over Seller's Chapter 11 case subject only to the Permitted Encumbrances and such other exceptions as the Title Company, without special premium, will omit as exceptions to coverage or will except with insurance against collection out of or enforcement against the Premises.

5.3    INTENTIONALLY OMITTED.

5.4    If Seller is unable to convey title in accordance with this Contract by the Closing Date, then Seller shall be entitled, at its election, to one (1) or more adjournments of the Closing Date for a period not to extend beyond ten (10) business days in the aggregate, and the Closing Date shall be adjourned to a date specified by Seller not beyond such period.  If, at the expiration of said period or, if Seller shall be unable to convey title to the Premises in accordance with this Contract or if the Bankruptcy Court shall fail to approve the sale pursuant to a plan of reorganization or other order, then, provided that Buyer did not create or cause the condition

preventing Seller to convey title in accordance with this Contract, Seller's sole obligation shall be to (i) cause the Escrow Agent to refund the Good Faith Deposit to Buyer, and (ii) refund Buyer's cost of examination of title without insurance and the cost of survey, not to exceed the aggregate of Two Thousand Five Hundred and 00/100 Dollars ($2,500.00) (the "**Buyer's Expense for Title Examination**"), whereupon this Contract shall terminate and neither party shall have any further rights or claims against the other, except for those obligations which expressly survive termination of this Contract.  If Buyer creates or causes the condition that prevents Seller from conveying title in accordance with this Contract, same shall constitute a default by Buyer under this Contract entitling Seller to exercise any and all remedies available to Seller set forth in this Contract.

5.5     Notwithstanding the provisions in Section 5.4 to the contrary, Buyer may, by notifying Seller at any time prior to the expiration of the period referred to in Section 5.4, if Seller elects to adjourn the Closing Date in accordance with Section 5.4, elect to accept such title as Seller can convey.  In such event, such Encumbrances that Seller was unable to discharge or otherwise remove shall be deemed to be a Permitted Encumbrance and this Contract shall remain in effect and the parties shall proceed to Closing and Buyer shall remain obligated to purchase the Premises for the full Purchase Price without any abatement, credit or allowance of any kind or any claim or right of action against Seller for Damages or otherwise for such Encumbrances.

5.6     Buyer and Seller shall cooperate with the Title Company in connection with obtaining title insurance insuring title to the Premises consistent with proceedings before the Bankruptcy Court and subject only to the Permitted Encumbrances.  In furtherance and not in limitation of the foregoing, at or prior to the Closing, Buyer and Seller shall deliver to the Title Company such affidavits, certificates and other instruments as are reasonably requested by such Title Company and customarily furnished in connection with the issuance of Owner's policies of title insurance.

6.     **Violations**.  Buyer agrees to take title subject to all notes or notices of violations of law or governmental ordinances, orders or requirements issued by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises issued prior to the date of closing (collectively, "**Violations**").  To the extent available, Seller shall provide to Buyer copies of all notes and notices of violations of law or governmental ordinances, orders or requirements issued by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises received by Seller and issued on or after the date of this Contract (collectively, "**Post-Contract Violations**").  If required, Seller, upon written request by Buyer, shall furnish to Buyer written authorization to make necessary searches to determine whether Violations have been noted or issued with respect to the Premises.

7.     **Litigation.**  Buyer acknowledges that Seller is subject to a pending Chapter 11 case and this Contract remains subject to Bankruptcy Court approval.  Accordingly, Buyer's obligations under this Contract shall not be affected by (i) the pendency of any of the litigation involving the Seller; or (ii) any other litigation affecting the Premises whether commenced prior to or subsequent to the date hereof, provided that such litigation does not have a material adverse effect on the transaction contemplated by this Contract and cannot be otherwise addressed by the Bankruptcy Court including discontinuation with prejudice of any filed or threatened foreclosure action.

8.    **Free and Clear Sale of Premises.**  At Closing Seller shall deliver title to the Premises free and clear of all liens, taxes, claims and other Encumbrances (except for Permitted Encumbrances), including all existing mortgages and any tax liens, pursuant to the applicable provisions of the Bankruptcy Code.

9.    **Closing Date**.

9.1    The closing (the "**Closing**") of the transactions contemplated hereunder shall occur no later than ten (10) days after Bankruptcy Court Approval becomes final, which is hereinafter referred to as the "**Scheduled Closing Date**".  The actual date of the Closing is hereinafter referred to as the "**Closing Date**"), at the offices of Goldberg Weprin Finkel Goldstein LLP, 125 Park Avenue 12th Floor, New York, New York 10017 or remotely in care of the Title Company.

10.    **Closing Documents**.

10.1.    Seller shall deliver to Buyer (duly executed where appropriate) at the Closing:

(a)    Surrender and Possession of the Premises;

(b)    a certificate evidencing that Seller is not a "foreign person" within the meaning of the Internal Revenue Code of 1986, as amended.  Based thereon, no portion of the Purchase Price shall be withheld by Buyer pursuant to the Internal Revenue Code;

(c)    a Bargain and Sale deed with covenants as to the Premises;

(d)    the Approval Order; and

(e)    any other documents required by this Contract, or reasonably requested by the Title Company to be delivered by Seller.

10.2.    Buyer shall deliver to Seller (duly executed where appropriate) at the Closing:

(a)    payment of the balance of the Purchase Price payable at the Closing;

(b)    Intentionally Omitted;

(c)    copy of the Formation Documents (i.e., Articles of Organization, Certificate of Incorporation, etc.) and the authorization or resolution of Buyer approving the transactions described in this Contract; and

(d)    any other documents required by this Contract, or reasonably required by the Title Company to be delivered by Buyer.

11.    **Adjustments and Costs**.

11.1    Unless otherwise provided below, the following are to be adjusted and prorated between Seller  and Buyer as of 12:01 A.M. (EST) on the Closing Date (the "**Effective**

**Time**"), based upon a 365-day year, and the net amount thereof shall be added to (if such net amount is in favor of Seller,) or deducted from (if such net amount is in Buyer's favor) the Purchase Price payable at Closing:

        (a)      Real estate Taxes and related charges for water and all public utilities, if any, on the basis of the fiscal period for which assessed. If on the Closing Date the Tax rate shall not have been fixed, the apportionment shall be based upon the Tax rate for the preceding year applied to the latest assessed valuation; however, adjustment will be made when the actual Tax amount is determined; and

        11.2    The amount of any unpaid real estate Taxes, assessments, water and public utility charges which Seller is obligated hereunder to discharge or satisfy, with any interest or penalties thereon, at the option of Seller, may be allowed as a credit to Buyer at the Closing, provided official bills therefore are furnished at the Closing. If on the Closing Date there are any mortgage liens or Encumbrances which Seller is obligated hereunder to discharge or satisfy, Seller may use any portion of the Purchase Price to discharge or satisfy the same, or may deposit with the Title Company an amount sufficient to discharge or satisfy the same, provided that, upon such deposit, the Title Company "omits" same from Buyer's title report and policy. The existence of liens, Encumbrances, real estate Taxes, assessments or water charges shall not be an objection to title, provided Seller shall comply with the provisions of this Section.

        11.3    Buyer shall pay all expenses for examination of title, the premium for any title insurance policy issued to Buyer, and all other title, survey or other expenses incurred by Buyer in connection with this Contract or the closing of title hereunder.

        11.4    To the extent not exempt pursuant to Section 1146 of the Bankruptcy Code, the Buyer shall at the Closing either pay, credit the Seller or deposit in escrow with the title company, unless the Bankruptcy Court determines otherwise, the amount necessary, if any, to pay in full an amount equal to the applicable local and state transfer taxes payable by reason of the sale of the Premises. Seller and Buyer agree to execute, swear to, and cause to be filed any applicable transfer tax returns or other returns required in connection with the Closing.

        11.5    Seller and Buyer each shall pay their own attorneys' fees in connection with this Contract and the closing of title.

        12.    **Bankruptcy Court Approval**. Bankruptcy Court Approval is required before the Seller may sell the Premises, pursuant to Sections 363(b) and (f) and 1123 and/or Section 1129 of the Bankruptcy Code. Upon execution of this Contract, Seller shall pursue Bankruptcy Court approval of this Contract by way of the filing of a so-called "Bidding Procedures and 363 Sale Motion". Buyer also acknowledges that it is a stalking horse purchaser and that the Bankruptcy Court shall consider higher or better offers for the Premises through a marketing and auction process. As a stalking horse, the Seller will request that the Buyer receive a break-up fee (equal to approximately three (3%) percent of the purchase price ($67,500)) and other customary bid protections. The break-up fee shall be paid to the Buyer at a closing with an alternate purchaser if the Buyer is subsequently out-bid for the Property based on a higher and better bid as approved by the Bankruptcy Court.

Additionally, upon the closing on a higher and better bid, the Deposit shall also be returned to the Buyer at that time.

13. **Conditions Precedent to Buyer's Obligation to Close**.  Buyer's obligation to consummate the transactions described in this Contract is subject to the satisfaction, at or prior to such Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

13.1    Seller has performed or complied in all material respects with all of the covenants and obligations required of Seller by this Contract.

13.2    The Bankruptcy Court Approval shall have been entered which is immediately effective.

14. **Conditions Precedent to Seller's Obligation to Close**.  Seller's obligation to consummate the transactions described in this Contract, and to take the actions required to be taken by Seller at the Closing, is subject to the satisfaction, at or prior to such Closing, of each of the following conditions (any of which may be waived by Seller, in whole or in part):

14.1    Buyer has performed or complied with all of the covenants and obligations required of Buyer by this Contract.

14.2    The Bankruptcy Court Approval shall have been entered which is immediately effective.

14.3    The Seller's senior lender (Sharestates Investments DACL, LLC) has consented to the Sale and the proposed disposition of the proceeds.

15. **Default**.  Provided Seller has obtained Bankruptcy Court approval and is otherwise ready, willing and able to close as provided herein and if the Buyer shall fail to close the transaction contemplated hereby as and when required, the Good Faith Deposit shall be paid over to Seller as agreed liquidated damages (as Seller's sole remedy and Buyer's sole obligation), it being acknowledged that in such event Seller will suffer substantial damages but such damages are incapable of exact ascertainment.  After payment to Seller of the Good Faith Deposit, neither party shall have any further rights or obligations hereunder except with respect to the provisions hereof which specifically survive termination.  If Seller shall fail to close the transaction contemplated hereby as and when required, Buyer shall have its rights and remedies and in equity to seek specific performance before the Bankruptcy Court.

16. **Escrow Conditions**.

16.1    In connection with this Contract, Buyer has and will pay the Good Faith Deposit on the timeframe set forth above by immediately available federal funds to Goldberg Weprin Finkel Goldstein LLP, 125 Park Avenue, 12th Floor, New York, New York 10017 ("**Escrow Agent**").

16.2    Escrow Agent shall hold the Good Faith Deposit in its IOLA Account without interest in accordance with this Contract. Escrow Agent hereby is authorized and directed to deliver the Good Faith Deposit to Seller if, as and when title closes. If Escrow Agent shall receive an instruction from Seller or Buyer as to the Good Faith Deposit, Escrow Agent shall act in accordance with such instruction if the other party shall fail to notify Escrow Agent not to act in accordance with such instruction within ten (10) business days after delivery of such instruction by Escrow Agent to said other party. Escrow Agent at any time may deposit the Good Faith Deposit with a court of competent jurisdiction, and, upon notice to Seller and Buyer of such deposit, Escrow Agent shall have no further responsibility or liability hereunder. Escrow Agent shall act upon any instruction or other writing believed by Escrow Agent in good faith to be genuine and to be signed or presented by the proper persons.

16.3    Buyer acknowledges that Escrow Agent is, pursuant to an Order of the Bankruptcy Court, attorney-in-fact to the Seller and has participated in the negotiations of the provisions of this Contract. Seller and Buyer acknowledge that Escrow Agent is merely a stakeholder, and that Escrow Agent shall not be liable for any act or omission unless taken or suffered in bad faith, in willful disregard of this Contract or involving gross negligence. Seller and Buyer shall jointly and severally indemnify and hold Escrow Agent harmless from and against any reasonable costs and reasonable expenses actually incurred in connection with the proper performance of the Escrow Agent's duties hereunder. If a dispute arises as to the holding of the Good Faith Deposit, Seller and Buyer shall be jointly and severally liable for, and shall pay Escrow Agent, any reasonable costs of Escrow Agent actually incurred in connection therewith. Notwithstanding that Escrow Agent is serving as the Escrow Agent pursuant to this Article, Escrow Agent as attorneys may represent Seller in the event of any dispute hereunder.

16.4    All instructions or notices given pursuant to this Article shall be in writing and delivered in accordance with the requirements for notices pursuant to this Contract. For purposes of this Article, such instructions and notices shall be deemed delivered on the date of delivery, if by hand, or on the date of mailing in accordance with Article 18 if mailed, except that no instruction or notice to Escrow Agent shall be deemed effectively delivered to Escrow Agent until actual receipt thereof by Escrow Agent. This Article may not be amended without the prior written Consent of Escrow Agent.

17.    **Brokerage**. Each party represents and warrants to the other that they have not dealt with any broker in connection with this sale. If the Buyer is declared the successful bidder at the auction sale to be conducted pursuant to Article 12 hereof based on the Purchase Price without competitive bidding, the Buyer shall not be responsible to pay any broker commission. In the event that the Buyer participates in the auction and is the successful bidder after submitting a higher offer than the Purchase Price, the Buyer shall be responsible to pay the buyer's premium of 5% being charges to all bidders at the auction, Each party agrees to indemnify and hold the other harmless from and against any and all liability, claim, loss, damage or expense, including reasonable attorneys' fees in connection with any other broker. The provisions of this Article shall survive the Closing.

18.    **Notices**. In order for the same to be effective, each and every notice, communication, request or demand permitted or required to be given by the terms and provisions of this Contract, or

by any law or ordinance shall be given in writing, in the manner provided in this Section unless expressly provided otherwise elsewhere in this Contract.

18.1    In the case of notices given by Seller to Buyer, any such notice shall be addressed to Buyer at its address as stated on the first page of this Contract.

18.2    In the case of notices given by Buyer to Seller, any such notice shall be addressed to Seller at its address as stated on the first page of this Contract, and a copy to Seller's attorneys, Goldberg Weprin Finkel Goldstein LLP, 125 Park Avenue, 12th Floor, New NY 10017, Attn: Kevin J. Nash, Esq., (212) 221-5700; knash@gwfglaw.com.

18.3    Each party hereby authorizes its attorney named above or any successor attorney or managing agent designated by such party to give and receive any notice on its behalf.

18.4    Notices may be given by telecopy, overnight courier with receipted delivery, or by any other manual or electronic means, or by hand delivery.  Notices so given shall be deemed served and given on the date of receipt if received before 5:00 P.M. on a business day, or on the first business day following receipt if it is received at any other time.

18.5    Either party may, by notice as aforesaid, designate one or more different parties and addresses for notices in lieu of those specified above.  Such designation shall be valid only when notice of such designation is given in the manner required herein.

19.    **Representations, Warranties and Covenants of Seller**.  Buyer represents, warrants and covenants to Seller that the sale shall be on "as is, whereas" basis based upon the following acknowledgments:

(a)    Except as otherwise expressly stated in this Contract, Seller makes no representation and warranty as to the Condition of the Premises, the operations of the Premises or the market conditions of the area in which the Premises is located and is conveying possession of the Premises to Buyer **AS IS, WHERE IS AND WITH ALL FAULTS** as of the date of this Contract, reasonable wear and tear, natural deterioration and damage by casualty excepted, and without representation or warranty of any kind or nature whether express or implied or arising by operation of law.  Seller specifically disclaims any warranty of merchantability or fitness for a particular purpose.  No adverse change in the Condition of the Premises prior to the Closing Date shall give rise to any obligation on the part of Seller or remedy on the part of Buyer, subject to Article 24 of this Contract.  Additionally, Seller makes no representations whatsoever concerning the Buyer's ability to develop or build at the Premises, and Buyer has made an independent evaluation regarding the future use or development of the Premises.  The due diligence material provided by Seller to Buyer is informational and Seller makes no representations regarding the accuracy or completeness of such material.

(b)    Without limiting the generality of the foregoing, except for the representations and warranties of Seller contained in this Contract, the transactions described in this Contract are without statutory, express or implied warranty, representation, agreement, statement or expression of any opinion regarding the Condition of the Premises, including any and all statutory,

express or implied representations or warranties related to their suitability for habitability, merchantability, or fitness for a particular purpose or created by any affirmation of fact or promise, by any description of the Premises or by operation of any legal requirements.

(c)　　For purposes of this Contract, the term "**<u>Condition of the Premises</u>**" shall mean all of the following:

(i)　　The quality, nature and adequacy of the physical Condition of the Premises, including (A) the quality of the design, labor and materials used to construct the improvements included in the Premises or in the construction of the Premises; (B) condition of structural elements, foundations, roofs, glass, mechanical, sewer, plumbing, electrical, HVAC and utility components and systems; (C) the capacity or availability of sewer, water, telecommunication or other utilities; (D) the geology, flora, fauna, soils, subsurface conditions, groundwater, landscaping and irrigation of the Premises, and its location in or near any special taxing district, flood hazard zone, wetlands area, protected habitat, geological fault or subsidence zone, hazardous waste disposal or clean-up site, or other special area; (E) the existence, location or condition of ingress, egress access and parking; (F) the condition of any fixtures; the presence of any asbestos or other Hazardous Materials, dangerous, or toxic substance, material or waste in, on, under or about the Premises thereon; (G) any environmental, botanical, zoological, hydrological, geological, meteorological, structural or other condition or hazard or the absence thereof heretofore, now or hereafter affecting in any manner the Premises; (H) the development of Premises; and (I) any other matter or thing related to the Premises.

(ii)　　The economic feasibility, cash flow and expenses of the Premises, and habitability, merchantability, fitness, suitability and adequacy of the Premises for its current use and purpose, and any condition at or which affects the Premises with respect to a particular use, purpose, development, potential or otherwise.

(iii)　　The compliance or failure to comply by Seller with (A) all legal requirements or Governmental Authorizations, including those relating to zoning, building, public works, parking, fire and police access, handicap access, life safety, subdivision and subdivision sales, and (B) all agreements, covenants, conditions, restrictions (public or private), development agreements, site plans, building Permits, building rules and other instruments and documents governing or affecting the use, management and operation of the Land or Buildings.

(iv)　　Those matters referred to in this Contract.

(v)　　The availability, cost, terms and coverage of liability, hazard, terrorism, comprehensive and any other insurance for the Premises or its operations.

20.　　**<u>Representations, Warranties and Covenants of Buyer</u>**.  Buyer represents, warrants and covenants to Seller (which representations, warranties and covenants shall not survive the Closing unless expressly provided otherwise herein) as follows:

20.1　　Buyer is or will be ***a corporation or limited liability company***, duly organized and existing under the laws of the State of New York.  The Buyer has the legal power, right and

authority to enter into this Contract and the instruments referenced herein and to consummate the transaction contemplated hereby.

20.2    Buyer has the power and authority to execute, deliver and perform this Contract, and has taken all actions required to authorize, execute, deliver and perform this Contract, including approval by the officers, directors or members of Buyer.  No Consent of filing with any Governmental Body is required for Buyer to execute this Contract and perform the transactions described in this Contract by the Buyer. The execution and delivery of this Contract by Buyer does not violate any provisions of the Organizational Documents of Buyer and will not result in a Breach or violation or default under any Order or Governmental Authorization to which Buyer is subject or result in a Breach by Buyer under any contract to which it is bound.  Neither the execution and the delivery of this Contract nor Buyer's compliance with the terms of this Contract will (a) violate any legal requirements applicable to Buyer, or (b) require the Consent or the making by Buyer of any declaration, filing or registration with any person.

20.3    In entering into this Contract, Buyer hereby represents to Seller that it has financial wherewithal to pay the balance of the purchase price without a financing contingency. Buyer's obligations under this Contract shall not be subject to any other contingencies, additional diligence or conditions.  Buyer represents that it has expertise in financial and business matters that enable Buyer to evaluate the merits and risks of the transactions described in this Contract.

20.4    All of the Buyer's representations, warranties and covenants set forth in this Contract shall be deemed made by Buyer to Seller as of the date of this Contract and as of the Closing Date.

21.    **No Assignment**.  This Contract may not be assigned by Buyer without the prior written consent of Seller, which may be given or denied in Seller's sole discretion.  Any agreement by Buyer to assign or transfer this Contract shall be deemed to constitute an "assignment" of this Contract for purposes of this Article.  Any breach by Buyer of the provisions of this Section 21 shall constitute a default by Buyer under the terms of this Contract, entitling Seller to exercise any and all remedies available to Seller under this Contract.  Notwithstanding the foregoing, Buyer may assign this Contract to an entity to be formed provided such assignment takes effect at Closing and Seller receives its full considerations hereunder

22.    **Purchase Price, Costs, Transfer and Sales Taxes**.  Buyer agrees to (i) pay any sales, use and similar Tax payable with respect to any personal property transferred in connection with the Premises and to indemnify and hold harmless Seller from and against any and all liability, loss, cost, damage and expense (including, but not limited to, interest, penalties and attorneys' fees) which Seller may sustain by reason of the non-payment of such Tax and (ii) file any sales, use or other Tax reports which may be required.  Buyer shall pay (a) the cost of the Survey, (b) the cost of premiums on the Title Policy, (c) the cost of having performed any due diligence, (d) the cost of any recordation fees to put the Deed of record with the appropriate Governmental Body, (e) all costs and expenses of obtaining any financing Buyer may elect to obtain, including, but not limited to, any fees, financing costs, mortgage and recordation Taxes and intangible Taxes in connection therewith, and (f) the cost of its legal counsel, advisors and other professionals employed by Buyer in connection with its purchase of the Premises from Seller. Seller shall pay the cost of (a) its legal counsel, advisors and other professionals

employed by Seller in connection with the sale of the Premises to Buyer, and (b) recordation fees, transfer taxes (unless exempt) and other expenses related to the discharge of any Encumbrance on the Premises that is not a Permitted Encumbrance.

23.    **Tax Exemption.**  The Approval Order shall provide that to the extent consistent with the Supreme Court's interpretation of Section 1146(a) of the Bankruptcy Code in <u>Florida Department of Revenue v. Piccadilly Cafeterias, Inc.</u>, 128 S.Ct. 2326 (2008), the transfer of the Premises shall be in furtherance of the Plan and, therefore, shall be exempt from payment of all transfer and recording taxes otherwise owed to a local, state or federal government unit, and shall provide that the recorder of deeds or similar official of a local, state or federal government unit in which the instrument contemplated by the sale be recorded, shall accept such instrument for recording without requiring the payment of any filing fees documentary stamp taxes or transfer taxes.

24.    **Risk of Loss**.

24.1    If, on or before the Closing Date, all or any of the Premises are (i) damaged or destroyed by fire or other casualty or (ii) taken as a result of any condemnation or eminent domain proceeding, Seller shall promptly notify the Buyer.  If the resulting casualty or condemnation would cause a diminution in value of the Land or Buildings of more than One Hundred Thousand Dollars ($100,000.00) (the **"Threshold"**), taken in the aggregate Buyer may terminate this Contract by delivery of notice of termination to the other within twenty (20) days after the date of such casualty or condemnation, **TIME BEING OF THE ESSENCE**.  If Buyer does not terminate this Contract prior to the expiration of such twenty (20) day period, or such casualty or condemnation does not cause a diminution in value of the Land and Buildings of more than the Threshold, taken in the aggregate, Buyer shall remain obligated to close the acquisition of the Premises without reduction in the purchase price.

24.2    At the Closing, Seller shall credit against the Purchase Price payable by Buyer an amount equal to the net proceeds, if any, received by Seller from such casualty and Seller shall be responsible to pay the applicable deductible under the subject insurance policy.  If, as of the Closing Date, Buyer has not elected to terminate this Contract pursuant to Section 25.1 above, and Seller has not received any such insurance proceeds, then the parties shall, nevertheless, consummate the transactions described in this Contract on the Closing Date, without any deduction for such insurance proceeds, and Seller shall, at the Closing, assign to Buyer all Seller's rights, if any, to the insurance proceeds and to all other rights or claims arising out of or in connection with such casualty and Seller shall, at Closing pay, or credit to Buyer, the applicable deductible.

25.    **Miscellaneous**.

25.1    All oral or written statements, representations, promises, and agreements of Seller and Buyer are merged into and superseded by this Contract, which alone fully and completely expresses their agreement, and this Contract contains all of the terms agreed upon by the parties with respect to the subject matter hereof.  This Contract has been entered into after full investigation.

25.2    None of the representations, warranties, covenants, or other obligations of parties hereunder shall survive the Closing, except as expressly provided herein.

25.3    This Contract may not be altered, amended, changed, waived, or modified in any respect or particular unless the same shall be in writing signed by Seller and Buyer.  No waiver by any party of any Breach hereunder shall be deemed a waiver of any other or subsequent Breach.

25.4    Neither this Contract nor any memorandum thereof shall be recorded by Buyer.  Any recordation or attempted recordation by Buyer of same shall be a material default by Buyer hereunder.

25.5    This Contract shall not be considered an offer or an acceptance of an offer by Seller, and shall not be binding upon Seller until executed and unconditionally delivered by Seller and Buyer, and approved by the Bankruptcy Court under the Approval Order.

25.6    This Contract may be executed by facsimile or electronically and in any number of counterparts, all of which taken together shall constitute one and the same instrument.

25.7    Section titles or captions in this Contract are included for purposes of convenience only and shall not be considered a part of the Contract in construing or interpreting any of its provisions.  All references in this Contract to Sections shall refer to Sections of this Contract unless the context clearly otherwise requires.

25.8    The parties have participated jointly in the negotiation and drafting of this Contract.  If any ambiguity or question of intent or interpretation arises, no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Contract.

25.9    Unless the context otherwise requires, when used in this Contract, the singular shall include the plural, the plural shall include the singular, and all pronouns shall be deemed to refer to the masculine, feminine or neuter, as the identity of the person or persons may require.

25.10   The parties do not intend that this Contract shall confer on any third party any right, remedy or benefit or that any third party shall have any right to enforce any provision of this Contract.

25.11   Any dispute, claim or action arising in connection with this Contract shall be adjudicated by the Bankruptcy Court.

25.12   This Contract shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York where the parties maintain business offices and the Bankruptcy Code, as applicable, without giving effect to any conflict of law rule or principle of such state.

25.13   Neither Seller nor Buyer nor any of their constituents have engaged in any dealings or transactions, directly or indirectly, (a) in contravention of any U.S., international or other money laundering regulations or conventions, including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, Trading with the Enemy Act (50 U.S. C. §1 *et seq.*, as amended), or any foreign asset control regulations of the

United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, or (b) in contravention of Executive Order No. 13224 dated September 24, 2001 issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with persons Who Commit, Threaten to Commit, or Support Terrorism), as may be amended or supplemented from time to time ("**<u>Anti-Terrorism Order</u>**"), or on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Organization of Economic Cooperation and Development, Financial Action Task Force, U.S. Office of Foreign Assets Control, U.S. Securities & Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, U.S. Internal Revenue Service, or any country or organization, all as may be amended from time to time. Neither Seller nor Buyer nor any of their constituents (i) are or will be conducting any business or engaging in any transaction with any person appearing on the U.S. Treasury Department's Office of Foreign Assets Control list of restrictions and prohibited persons, or (ii) are a person described in section 1 of the Anti-Terrorism Order, and to the best of each party's knowledge, neither Seller nor Buyer nor any of their Affiliates have engaged in any dealings or transactions, or otherwise been ass\ociated with any such person.

SEE RIDER ANNEXED HERETO AND MADE A PART HEREOF.

**IN WITNESS WHEREOF**, Seller and Buyer have duly executed this Contract on the date first above written.

**BANKRUPTCY ESTATE OF 1777 HOMES LLC, as SELLER**

By:_____

     Joel Perl, Authorized Signatory

**CUBE 4 EQUITES, INC, as BUYER**

By:_____

     Robert Lebensfeld, Authorized Signatory

GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP hereby executes this Contract for the sole purpose of agreeing to serve as Escrow Agent in accordance with the provisions of Article 16 of this Contract.

GOLDBERG WEPRIN FINKEL GOLDSTEIN LLP

By: _____

     Kevin J. Nash, Esq.

15

# SCHEDULE 1

## Defined Terms

"Approval Order" means an order (together with any findings of fact and conclusions of law) entered by the Bankruptcy Court confirming a plan of reorganization or liquidation and/or approving the transfer of the Premises to Buyer in accordance with the provisions of this Contract, free and clear of all liens, claims and other encumbrances.

"Bankruptcy Court" means the United States Bankruptcy Court, Eastern District of New York, supervising the Seller's pending Chapter 11 case entitled: *In re 1777 Homes LLC* Case No. 23-42367-JMM.

"Bankruptcy Court Approval" means the Approval Order has been entered by the Bankruptcy Court in the bankruptcy case or by any other court exercising competent jurisdiction over the Seller provided that such order: (i) has become final and no longer subject to appeal; or (ii) if an appeal has been filed, either the Bankruptcy Court or such appellate court has not stayed the sale to be consummated hereunder, (or if stayed, the stay has been lifted).

"Encumbrance" means any charge, claim, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

"Environmental Claims" means any assertion by any person of a cause of action with respect to the Premises in connection with the presence of any Hazardous Materials or violation of any Environmental Law, whether or not reduced to a judgment.

"Environmental Law" means all Legal Requirements and all Contractual obligations concerning public health and safety, employee health and safety, and pollution or protection of the environment, (including indoor or outdoor air, surface water, groundwater, land surface or subsurface) or the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, management, remediation or abatement of any Hazardous Materials, each as amended and as now or hereafter in effect.

"Governmental Body" means any (a) nation, state, county, city, town, village, district, or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign, or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or Entity and any court or other tribunal); (d) multi-national organization or body; or (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or Taxing authority or power of any nature.

"Hazardous Materials" means any waste or other substance that is listed, defined, designated, or classified as, or otherwise determined to be, hazardous, radioactive, or toxic or a pollutant or a contaminant under or pursuant to any Environmental Law, including any mixture or solution thereof, and specifically Including petroleum and all derivatives thereof or synthetic substitutes therefore and asbestos or asbestos-containing materials.

## <u>RIDER TO CONTRACT</u>

In addition to the Contract, the parties make the following agreements and representations, to survive the Closing:

1.      Seller makes the following representations which are materially true as of the date hereof and shall be true at Closing:

   (a)      The are no current tenants, occupants or leases affecting the Premises.

   (b)      There are no actions with reference to Seller or the Premises pending with any court (except for the Bankruptcy Case) which would materially interfere with Seller's ability to convey title as required herein.

   (c)      No demand has been made by any insurance company requiring any work to be done on the Premises or for additional fire insurance and if there are any, Seller shall comply with same at Seller's sole cost and expense. Seller shall maintain the Premises in their present order and repair and shall make any and all repairs or replacements until Closing so as to deliver the Premises in substantially their present condition, usual wear and tear excepted.

   (d)      There are no service contracts now in effect.

   (e)      There are no pending or threatened condemnation proceedings nor does Seller have notice or knowledge of any.

   (f)      If there are any pending certiorari proceedings for the reduction of taxes, Seller shall not settle any such claim for the current tax year without the prior written consent of Buyer.

2.      Seller shall deliver the Premises at Closing in vacant "as is" condition, free of tenants, occupants and leases.

3.      The downpayment shall be deemed made for the account of Seller by paying same to Seller's attorney to be held in escrow subject to the terms of this Contract.

4.      Seller shall not remove any supplies or equipment now on the Premises which are used in connection with the operation of the building.

5.      Buyer, its agents or assigns, shall have the right to inspect the property at reasonable times after the execution of this Agreement, provided it shall first give Seller reasonable advance notification of its intention to conduct any such inspection of at least two (2) days.

6.      To the extent in Seller's possession, Seller agrees to make available to Buyer, prior to and/or after the Closing at any time upon demand, all records of Seller in connection with the management and operation of the Premises during the period of Seller's ownership, and to provide copies to the extent available of all paid bills, vouchers, cancelled checks, and other documents as may be reasonably requested by Buyer.

7.      Any mortgage presently affecting the Premises which Seller must discharge in accordance with the provisions of this Contract shall, subject to the mortgagee's approval, at Buyer's option, and with reasonable legal charge or cost to Buyer, be assigned to Buyer's designee and Seller shall request delivery of all original notes, mortgages and prior assignments to the extent available.  The assignment of mortgage is discretionary upon the mortgagee and the failure to obtain same is not a breach of this Contract.

8.      At the Closing, Seller shall deliver to Buyer:

      (a)      All of the plans and specifications relating to the Premises in the possession of Seller or its agents.

      (b)      All permits, certificates, licenses and approvals required for the use and operation of the Premises.

9.      Seller represents that no person, firm, corporation or other entity has any right or option to acquire the Premises, any portion thereof or any interest therein. This paragraph shall survive the Closing.

10.     Seller shall obtain a final (actual) water meter reading for each water meter at least thirty (30) days prior to the Closing.

11.     Seller covenants that it will not, prior to the Closing:

      (a)      Make any change in the present use of the Premises.

      (b)      Generate, store or dispose of Hazardous Materials on or from the Premises or allow others to do so.

Seller further covenants, pending Closing, that it will comply with all environmental laws.

12.     Seller shall maintain full replacement fire insurance from the date of this Contract to and including the date of Closing.

13.     At either (or both) party's option, the other party agrees to cooperate with the requesting party to qualify this transaction as a like-kind exchange of property as described in Section 1031 of the Internal Revenue Code of 1986, as amended, including a "reverse exchange". The non-requesting party further agrees to consent to the assignment of this Contract to a "Qualified Intermediary" and/or take such further and other action reasonably necessary to qualify this transaction as a like-kind exchange provided that (i) such exchange shall be at the sole cost and expense of the requesting party; and (ii) the non-requesting party shall incur no liability as a result of such exchange ; and (iii) no such assignment of this Contract shall relieve the requesting party of its obligations under this Contract and the requesting party shall remain liable for the performance of its obligations hereunder, including, without limitation, the representations, warranties and covenants given by the requesting party to the non-requesting party in this Contract.

14.     In the event of any conflict between this Rider and the Contract, this Rider shall control.